United States District Court
Southern District of Texas
**ENTERED**
March 31, 2021
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| DANIEL MORRIS SANDERS (TDCJ–CID #02044542), | § § § | CIVIL ACTION NO. 4:19-cv-04079 |
| Petitioner, | § § § | |
| vs. | § § § | JUDGE CHARLES ESKRIDGE |
| BOBBY LUMPKIN, Respondent. | § § § § | |

MEMORANDUM AND OPINION ON DISMISSAL

The motion for summary judgment by Respondent Bobby Lumpkin is granted. Dkt 11. The motion by Petitioner Daniel Morris Sanders for partial summary judgment is denied. Dkt 17.

The petition for a writ of *habeas corpus* brought by Sanders is dismissed with prejudice. Dkt 1. This dismissal resolves several other pending motions. See Dkts 13, 15, 16.

1.   Background

A jury found Sanders guilty in November 2015 in Cause Number 1438488 before the 184th Judicial District Court of Harris County, Texas. The First Court of Appeals summarized the pertinent factual background (with use of pseudonyms for the victim and family members) as follows:

> Tara's mother is Daphne White. Her father is Sanders. White and Sanders were dating when Tara was born and separated when Tara was almost one year old. Growing up, Tara mostly lived with her maternal grandmother . . . and occasionally lived with her mother. Tara never lived with Sanders and did not have a close relationship with him.

At the beginning of Tara's freshman year of high school, Sanders and White reunited and began living together. Tara remained living with her grandmother, but she visited her parents during the weekends and holidays, including Christmas break of 2013. During this visit, Sanders sexually assaulted Tara twice, once before Christmas and once between Christmas and New Year's.

At the end of the break, Tara returned to her grandmother and eventually told her what had happened. Tara's grandmother took her to the police station, where Tara provided a statement, and then to the Children's Assessment Center, where Tara received a medical examination from Dr. Marcella Donaruma, a child-abuse pediatrician. Dr. Donaruma found that Tara's hymen had been "broken" and "torn" and that Tara's injury was "consistent" with her account of the assault because the injury indicated that there had been "blunt force penetrating trauma to her vagina."

*Sanders v State*, 2017 WL 2806785, *1–2 (Tex App—Houston [1st Dist] pet refd) (unpublished).

The associated testimony and evidence were of their nature graphic. The jury heard evidence that Sanders sexually assaulted his biological daughter, Tara, on the 21st and 28th of December in 2013. Tara testified that she was then sixteen years of age and described the events in stark terms. Dkt 12-12 at 17–51. The latter date was more severe, involving forcible penetration after Sanders induced her to smoke marijuana.

Shortly after, Tara told what had happened to her grandmother and a female youth minister. Her grandmother testified. See id at 92–115. This resulted in investigation by the Houston Police Department. Officer Randall Kelley is an officer with the Houston Police Department, Child Sexual Abuse Unit, Special Victims Division. He was the investigating officer, and he testified on the details of his investigation, including his ultimate

2

decision that charges be filed against Sanders. Id at 125–39. Susan Odhiambo is an employee at the Children's Assessment Center, and she testified on the forensic interview she conducted with Tara. Id at 146–57. Tara was also seen shortly thereafter for medical examination by Dr Donaruma. She testified to observing trauma, including that as described in the appellate opinion above. Dkt 12-13 at 13–39.

Five other witnesses who spent considerable time at the house over that Christmas break also testified as to what they observed about interactions by Sanders with Tara during that time. See Dkt 12-13 at 104–17 (mother); id at 75–83 (half-brother); id at 146–51 (cousin); id at 50–57 (godmother); id at 90–98 (mother's godson). And Sanders testified in his own defense. Id at 159–72.

Upon conviction by the jury, Sanders elected to have the trial court assess punishment. As part of that proceeding, he pleaded "true" to prior convictions of (1) felony violation of a protective order, (2) felony attempted violation of a protective order; (3) two misdemeanor violations of a protective order, (4) felony burglary of a habitation, (5) felony theft from a person, (6) misdemeanor assault on a family member, and (7) misdemeanor possession of marijuana. Dkt 12-16 at 45–46. The trial court sentenced him to sixty-five years in prison. Dkt 12-36 at 207.

Sanders appealed, asserting issues of ineffective assistance of counsel and improper jury argument. The First Court of Appeals overruled those issues and affirmed his conviction in June 2017. *Sanders*, 2017 WL 2806785. Sanders filed a petition for discretionary review with the Texas Court of Criminal Appeals, which was refused on October 25, 2017. *Sanders v State,* No PD-0768-17 (Tex Crim App 2017). He then filed a state application for a writ of *habeas corpus*. Dkt 12-36 at 7–73. The Texas Court of Criminal Appeals denied it without written order on August 21, 2019. Dkt 12-32 at 1.

Sanders filed the instant federal petition for a writ of *habeas corpus* in October 2019. Dkt 1. He contends that his conviction is void for several reasons specified further below. But broadly stated, he asserts three things. First, that the trial judge improperly commented on the weight of the evidence during

3

*voir dire*. Second, that his trial counsel was ineffective in a number of ways. And third, that his appellate counsel was also ineffective as to the same issues on appeal.

2.   Legal standard

Respondent moves for summary judgment, arguing that all claims by Sanders lack merit and must be dismissed. Dkt 11. He attached the trial transcript and other state-court records to that motion. Dkts 12, 12-1 through 12-36. Sanders also moves for summary judgment in part, asserting entitlement to judgment as a matter of a law as to his claim for trial-court error, two of five grounds of his claim for ineffective assistance of trial counsel, and his claim for ineffective assistance of appellate counsel. Dkt 17 at 2; see also Dkt 1 at 6–7, 9.

Sanders proceeds here *pro se*. A *pro se* petition is construed liberally and isn't held to the same stringent and rigorous standards as pleadings filed by lawyers. See *Martin v Maxey,* 98 F3d 844, 847 n 4 (5th Cir 1996); *Bledsue v Johnson,* 188 F3d 250, 255 (5th Cir 1999).

*AEDPA generally.* The Antiterrorism and Effective Death Penalty Act, 28 USC § 2241 *et seq*, governs this federal petition for *habeas corpus*. See *Woodford v Garceau*, 538 US 202, 205–08 (2003); *Lindh v Murphy*, 521 US 320, 335–36 (1997). This has consequences for the standard of review as to disputed questions of both law and fact.

*Disputed questions of law.* AEDPA bars federal *habeas corpus* relief based upon claims that were adjudicated on the merits by state courts unless the decision of the state court "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 USC § 2254(d); see also *Early v Packer*, 537 US 3, 7–8 (2002); *Cobb v Thaler*, 682 F3d 364, 372–73 (5th Cir 2012). The Fifth Circuit holds that a state-court decision is *contrary to clearly established federal law* "if it reaches a legal conclusion in direct conflict with a prior decision of the Supreme Court or if it reaches a different conclusion than the Supreme Court based on materially indistinguishable facts." *Gray v Epps*, 616 F3d 436, 439

4

(5th Cir 2010), citing *Williams v Taylor*, 529 US 362, 404–08 (2002). And the Fifth Circuit holds that *an unreasonable application of federal law* means that the decision is "unreasonable, not merely wrong; even clear error will not suffice." *Escamilla v Stephens*, 602 F Appx 939, 941 (5th Cir 2015, *per curiam*), quoting *White v Woodall*, 572 US 415, 419 (2014). This is a high bar. To satisfy it, a petitioner must "show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Woods v Donald*, 575 US 312, 316 (2015), quoting *Harrington v Richter*, 562 US 86, 103 (2011).

*Disputed questions of fact.* AEDPA precludes federal relief unless the merits adjudication by the state court was based on an "unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 USC § 2254(d)(2); see also *Martinez v Caldwell*, 644 F3d 238, 241–42 (5th Cir 2011). A state court's factual determinations are "presumed to be correct" unless the petitioner rebuts those findings with "clear and convincing evidence." 28 USC § 2254(e)(1). This presumption of correctness extends not only to express factual findings, but also to implicit or "unarticulated findings which are necessary to the state court's conclusion of mixed law and fact." *Murphy v Davis*, 901 F3d 578, 597 (5th Cir 2018), quoting *Valdez v Cockrell*, 274 F3d 941, 948 n 11 (5th Cir 2001).

*AEDPA and Rule 56.* The Fifth Circuit holds, "As a general principle, Rule 56 of the Federal Rules of Civil Procedure, relating to summary judgment, applies with equal force in the context of habeas corpus cases." *Clark v Johnson*, 202 F3d 760, 764 (5th Cir 2000). But where Rule 56 and the rules governing *habeas corpus* petitions conflict, the latter governs. *Austin v Davis*, 647 F Appx 477, 483 (5th Cir 2016, *per curiam*); see also *Torres v Thaler*, 395 F Appx 101, 106 n 17 (5th Cir 2010, *per curiam*) (citations omitted). As such, the presumption of correctness mandated by § 2254(e)(1) "overrides the ordinary summary judgment rule that all disputed facts must be construed in the light most favorable to the nonmoving party." *Austin*, 647 F Appx at 483 (citation omitted); cf *Anderson v Liberty Lobby*, 477 US 242, 255 (1986)

(stating typical summary-judgment standard in civil cases).

*Reasonableness of state court findings.* When determining the reasonableness of the state court's findings and conclusions, a federal court on petition for writ of *habeas corpus* may only consider the factual record that was before the state court. *Cullen v Pinholster*, 563 US 170, 180–81 (2011). And the Supreme Court instructs that it "may not characterize these state-court factual determinations as unreasonable 'merely because [it] would have reached a different conclusion in the first instance.'" *Brumfield v Cain*, 576 US 305, 313–14 (2015), quoting *Wood v Allen*, 558 US 290, 301 (2010). To the contrary, § 2254(d)(2) requires the federal court to "accord the state trial court substantial deference." *Brumfield*, 576 US at 314.

*Pertinence of state court determinations.* An articulated opinion from a state court has natural pertinence to resolution of disputed questions of both law and fact on *habeas corpus* review. But some state-court decisions reach a conclusion without such articulation. What then? The Fifth Circuit holds, "When faced with a silent or ambiguous state habeas decision, the federal court should 'look through' to the last clear state decision on the matter." *Jackson v Johnson*, 194 F3d 641, 651 (5th Cir 1999), quoting *Lott v Hargett*, 80 F3d 161, 164 (5th Cir 1996). This is because a presumption exists that later, unexplained orders rejecting a federal claim are decided on the same basis as earlier, reasoned orders resting upon the same ground. *Ylst v Nunnemaker*, 501 US 797, 803 (1991). This also accords with decisional practice of the Texas criminal courts. The Texas Court of Criminal Appeals holds that a statement of *denial* of a state application for a writ of *habeas corpus* without written order signifies an adjudication that the court below reached the correct ruling on the merits (as compared to a statement of *dismissal*, which means only that the claim was declined on grounds other than the merits). *Ex parte Torres*, 943 SW2d 469, 472 (Tex Crim App 1997, *en banc*); see also *Singleton v Johnson*, 178 F3d 381, 384 (5th Cir 1999).

Even so, the state court's decision will at times be unaccompanied by explanation, with no level of review having issued a reasoned opinion. The Supreme Court holds in such

situations that "the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." *Harrington*, 562 US at 98; see *Salts v Epps*, 676 F3d 468, 480 n 46 (5th Cir 2012) (applying *Harrington*).

*Requisite injury arising from error.* A petitioner seeking a writ of *habeas corpus* must also demonstrate injury of a certain character. To warrant relief based on state-court error, a petitioner must show the alleged error had "substantial and injurious effect." *Brecht v Abrahamson*, 507 US 619 (1993); for example, see *Hughes v Quarterman*, 530 F3d 336, 345 (5th Cir 2008). This high bar isn't met where evidence of the defendant's guilt is overwhelming. *Burgess v Dretke*, 350 F3d 461, 472 (5th Cir 2003). There must be more than a mere reasonable possibility that it contributed to the verdict. *Brecht*, 507 US at 638. But where a court is confident that the error caused grave harm—or even if the record is evenly balanced in this regard—the petitioner is entitled to relief. See *Fry v Pliler*, 551 US 112 n 3 (2007), citing *O'Neal v McAninch*, 513 US 432, 435 (1995); see also *Robertson v Cain*, 324 F3d 297, 305 (5th Cir 2003).

*Other limitations.* Finally, several other technical or procedural limitations can foreclose federal *habeas corpus* relief. For instance, a federal claim is foreclosed if it is barred because of a failure to comply with state procedural rules. See *Coleman v Thompson*, 501 US 722 (1991). It is likewise foreclosed if it seeks retroactive application of a new rule of law to a conviction that was final before the rule was announced. See *Teague v Lane*, 489 US 288 (1989).

### 3.   Analysis

Sanders asserts claims for relief of trial-court error, ineffective assistance of trial counsel, and ineffective assistance of appellate counsel.

#### a.   Trial court error

Sanders attacks two statements made by the trial judge to the venire when empaneling the jury, as described below. Dkt 1 at 6; Dkt 12-11 at 39. These, he says, violated his rights under the Sixth and Fourteenth Amendments because they improperly commented on the weight of the evidence and contravened the presumption of innocence.

7

A trial court plainly must refrain from making any remark calculated to convey to the jury its opinion of the case. For example, see *Caldwell v Thaler*, 770 F Supp 2d 849, 864–65 (SD Tex 2011), citing Tex Code Crim Proc art 38.05. "A trial judge may comment on the evidence provided the final decision as to the guilt or innocence of the defendant is left unequivocally to the jury's determination." *United States v Walker*, 596 F Appx 302, 318 (5th Cir 2015, *per curiam*), quoting *Thurmond v United States*, 377 F2d 448, 451 (5th Cir 1967). "The trial court improperly comments on the weight of the evidence if it makes a statement that implies approval of the State's argument, indicates disbelief in the defense's position, or diminishes the credibility of the defense's approach to the case." *Dunn v State*, 2013 WL 3770917, *2 (Tex App—Houston [14th Dist] pet refd), citing *Simon v State*, 203 SW3d 581, 590 (Tex App—Houston [14th Dist] 2006, no pet). And the trial court must leave intact the presumption of innocence owed to every defendant. *Delo v Lashley*, 507 US 272, 278–79 (1993).

Beyond that, the United States Constitution doesn't establish or require any particular script that the trial court must follow with the jury. State trial judges are afforded great discretion in empaneling a jury and presiding over a trial when reviewed on federal petition for writ of *habeas corpus*. *United States v Shannon*, 21 F3d 77, 82 (5th Cir), cert denied, 513 US 901 (1994). The Fifth Circuit holds, "Improper comments by a trial judge do not entitle the defendant to a new trial unless the comments are error that is substantial and prejudicial to the defendant's case." *United States v Wallace*, 32 F3d 921, 928 (5th Cir 1994), quoting *Ruiz v Estelle*, 679 F2d 1115, 1129 (5th Cir), cert denied, 460 US 1042 (1982).

The trial judge addressed the venire during *voir dire* as follows:

> *This jury will not determine the punishment if the defendant is found guilty. In this particular case I will determine the punishment.* Is there anybody who is troubled by that; who says, Well, if I don't get to determine the punishment, I could never find somebody guilty. Anyone who would have problems with that? Sometimes the jury does it,

> sometimes the Judge. Anybody have any
> questions about it?

Dkt 12-11 at 39 (emphasis added). Sanders maintains that the italicized portion was a comment on the "weight of the evidence." Dkt 1 at 6.

A member of the venire asked why the jury couldn't assess punishment. The trial judge responded that she couldn't answer at that time, but that she would explain after the trial was over. Dkt 12-11 at 52–53. Another member of the venire asked shortly after what the punishment range was. The trial judge responded:

> The law does not allow me to discuss that with
> you because it's irrelevant to any finding of guilt
> or innocence. So, after the trial, I will be glad to
> tell you. And, in fact, *I usually I do sentencing right
> after the trial. So, some of the jurors might want to stay
> and watch the sentencing hearing.*

Dkt 12-11 at 55–56 (emphasis added). Sanders argues that the italicized portion constituted an inference to the *venire* that "the trial court knew something of [Sanders]'s guilt that they did not know . . ." Dkt 1 at 6. He also asserts that the comment "vitiated the presumption of innocence and jury impartiality adversely affecting his right to a fair trial." Ibid.

The Court has made its own review of the record regarding the challenged statements and the context in which they were made. These statements occurred during *voir dire.* This was necessarily before the jury was empaneled, before any evidence had been presented, and before it was known whether or not Sanders would testify. The transcript shows that the trial judge advised the venire that Sanders wasn't required to testify. Dkt 12-11 at 43. And at the conclusion of all evidence, the charge of the court stated that the jurors were the exclusive judges of the facts and the credibility of witnesses. Dkt 12-22 at 85.

The challenged statements also came within a larger discussion during *voir dire* itself. Within that context, the trial judge explained that there are two phases of a trial, with one to determine guilt or innocence, and another to determine punishment, if necessary. She described the different standards of proof and explained that the burden of proof in a criminal case

is beyond a reasonable doubt. Dkt 12-11 at 40. And she explained the presumption of innocence accorded the defendant throughout trial:

> The defendant gets the presumption of innocence. There are many ways to explain that. The way that has always worked best for me, when I see a defendant come into the courtroom, I see him in like a bubble or space helmet or something; and that protects him. That defendant is an innocent person. I know that you have heard that since you were a kid, innocent until proven guilty; but it really is a cornerstone of our system. And so, it's very important you be able to give the defendant the presumption of innocence. And I'm going to step over here.
>
> Would you stand, please, Mr. Sanders?
>
> So, I'm going to ask everybody to look at him; and you need to be able to see him as an innocent person. You don't have to be able to see the bubble thing, but you do need to be able to give him the very important presumption of innocence. And of course, you haven't heard any evidence at all, any testimony. So, he is an innocent person at this point in time.

Dkt 12-11 at 40–41.

As such, the challenged statements in context weren't a comment on the weight of the evidence. They also didn't anticipate that the presumption of innocence would be overcome or impugn that presumption in any way. Rather, these statements simply reflect an effort by the trial judge to explain the phases of a jury trial in Texas. She quite clearly specified the presumption of innocence and accorded it to Sanders.

The Texas Court of Criminal Appeals denied this claim without written order, meaning it affirmed the decision by the First Court of Appeals. See Dkt 12-32 at 1; *Ex parte Torres*, 943 SW2d at 472. Sanders fails to establish, as is his burden, that the state court's decision was contrary to clearly established

federal law or an objectively unreasonable application of it. 28 USC § 2254(d); *Cobb*, 682 F3d at 372–73.

Even were error assumed, Sanders hasn't shown that the challenged portions of the trial judge's comments had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht,* 507 US at 623. Indeed, substantial evidence was presented against Sanders, as summarized above. This included graphic testimony by Tara of how Sanders sexually assaulted her twice over Christmas break of 2013. Tara's grandmother testified that she had witnessed Sanders wrestling and touching Tara inappropriately on her breasts and between her legs prior to that time. Dkt 12-12 at 102. And Dr Donaruma testified that she examined Tara and saw "blunt force penetrating trauma to her vagina," which resulted in an interrupted hymen consistent with what Tara said happened to her. Dkt 12-13 at 24–25. As such, Sanders fails to establish that a reasonable probability exists that the verdict would have been different if the trial judge hadn't made the statements about assessing punishment. This means that any such error was harmless.

Sanders hasn't shown that he is entitled to relief on this assertion of error by the trial court as to statements made during *voir dire.* The decision by the state appellate court as to trial-court error also reasonably applied the law to the facts, consistent with clearly established federal law. As such, Sanders hasn't shown that he is entitled to *habeas corpus* relief on this claim. 28 USC § 2254(d)(1).

b.   Ineffective assistance of trial counsel

Sanders asserts that his trial counsel was ineffective in a number of ways. As detailed below, he asserts that his counsel failed to object and request a mistrial due to the trial judge's improper comments; to seek recusal of the trial judge based upon questionable impartiality; to object to the State's bolstering of the veracity of witnesses; to prepare Sanders to testify; and to request a balancing test for admittance of prior convictions.

Sanders must demonstrate both *deficient performance* and ensuing *prejudice* to establish ineffective assistance by his trial counsel. See *Strickland v Washington*, 466 US 668 (1984); see also *Charles v Stephens*, 736 F3d 380, 388 (5th Cir 2013). "Both the

*Strickland* standard and the AEDPA standard are highly deferential, and when the two apply in tandem, review is doubly so." *Charles*, 736 F3d at 389 (internal quotations and citation omitted); see also *Harrington*, 562 US at 105.

To establish *deficiency*, the petitioner must show that the performance by trial counsel fell below an objective standard of reasonableness based on "prevailing norms of practice." *Loden v McCarty*, 778 F3d 484, 494 (5th Cir 2016); see also *Kitchens v Johnson*, 190 F3d 698, 701 (5th Cir 1999). Courts should be "highly deferential" to counsel. *Strickland*, 466 US at 689. This means that "counsel is strongly presumed to have rendered adequate assistance and to have made all significant decisions in the exercise of reasonable professional judgment." Id at 690. This is particularly true as to "strategic choices made after thorough investigation of law and facts relevant to plausible options," which are "virtually unchallengeable." Id at 690–91; see also *United States v Jones*, 287 F3d 325, 331 (5th Cir), cert denied, 537 US 1018 (2002). "*Strickland* does not require deference to those decisions of counsel that, viewed in light of the facts known at the time of the purported decision, do not serve any conceivable strategic purpose." *Moore v Johnson*, 194 F3d 586, 615 (5th Cir 1999). But beyond this, the Fifth Circuit describes the deficient-performance standard as requiring counsel to have "blundered through trial, attempted to put on an unsupported defense, abandoned a trial tactic, failed to pursue a reasonable alternative course, or surrendered his client." *Jones*, 287 F3d at 331.

To establish *prejudice*, the petitioner must show a reasonable probability that—absent the deficient performance—the outcome of the proceedings would have been different. *Reed v Stephens*, 739 F3d 753, 773 (5th Cir 2014), quoting *Strickland*, 466 US at 687. In this context, a *reasonable probability* is one that is sufficient to undermine confidence in the outcome of the proceedings. *Strickland*, 466 US at 694.

i.   Failure to object and request a mistrial

As discussed above, Sanders contends that the trial judge made improper comments on the weight of the evidence during

*voir dire*. Here, he argues that his counsel was ineffective for failing to object and request a mistrial as to these statements. Dkt 1 at 7.

It has already been determined that the subject comments weren't improper. Assertion about the supposed failures of his counsel in this regard lacks merit. Counsel can't be deficient for failing to press a meritless point. *Koch v Puckett*, 907 F2d 524, 527 (5th Cir 1990); see also *Green v Johnson,* 160 F3d 1029, 1036–37 (5th Cir 1998), cert denied, 525 US 1174 (1999), citing *Sones v Hargett,* 61 F3d 410, 415 (5th Cir 1995).

Beyond this, Sanders fails to prove that the trial court would have sustained an objection or granted a mistrial in this regard, if made or requested. He offers no evidentiary support besides conclusory allegations.

### ii. Failure to seek recusal

Sanders asserts that his counsel was ineffective by failing to seek recusal of the trial judge on the basis that she was biased against him. Dkt 1 at 8. Sanders alleges that the trial judge coached the prosecutor on "what evidence they needed to prove their case; what evidence they should or should not present; what evidence the State earlier mentioned that the jury would want to see, then making erroneous admissibility rulings that benefitted the State." Ibid. Sanders further asserts that the case would have been reassigned to another judge if counsel had sought recusal.

It is incumbent on the petitioner to identify clear grounds of ineffective assistance. See *Clark v Collins*, 19 F3d 959, 964 (5th Cir 1994). As to this issue, those grounds are stated under Texas law at Rule 18b of the Texas Rules of Civil Procedure, which governs recusal in "any trial court other than a statutory probate court or justice court." Tex R Civ Proc 18a(a); for example, see *Arnold v State*, 853 SW2d 543, 544 (Tex Crim App 1993, *en banc*). Sanders identifies nothing under these rules demonstrating actual or presumptive bias that could have supported a recusal motion. Failure to raise a meritless motion isn't ineffective assistance. See *United States v Gibson*, 55 F3d 173, 179 (5th Cir 1995).

Given that Sanders proceeds *pro se*, the record has nonetheless been reviewed for discussions that the trial judge had with the prosecutor and his trial counsel. These include:

- o  Discussion whether Tara made an outcry statement when she was eight years old against her stepfather, who pleaded guilty to indecency by contact. The trial judge observed that such evidence wouldn't undermine the State's case, and instead showed that Tara's mother was "not very responsible for keeping her safe." Dkt 12-12 at 59–60.

- o  Discussion whether Officer Kelley could testify about Sanders's statement that the clothing Tara wore on the night of the offense was available for testing. The trial judge identified the pertinent hearsay rule and sustained the State's objection. Dkt 12-12 at 141.

- o  Discussion whether testimony by a specialist in child protection and forensic pediatrics left a false impression with the jury that Sanders touched Tara in one way but not another. The prosecutor was referring to the fact that Sanders tickled Tara in addition to other violent touching on a different date. The trial judge told the prosecutor that she could clarify that Sanders also touched her when he tickled her. Dkt 12-13 at 47–48.

None of these demonstrates the sort of obviously prejudicial comments to which Sanders's trial counsel should have objected and sought recusal. Cf *Evans v Cockrell*, 285 F3d 370, 377 (5th Cir 2002).

The trial judge also expressed skepticism during discussions with counsel about certain arguments the prosecutor intended to raise. For instance, the trial judge stated:

> THE COURT: Can I—can I make a suggestion? And, really, I don't need this on the record, I guess; but I will put it on because I like everything on the record. But I think instead of worrying about some of this simple stuff, the State would have worried more about their evidence, you know. I mean, you got some serious issues on some evidence that was never explained about. And, you know, I just—just—

I just don't understand why you put so much time and energy in trying to get this poetic stuff into the record, getting him to admit stuff about the girl's motive, you know. I think the things to focus on are diagrams and clothing we don't know what happened to. And we get to see all these pictures of the equipment in the exam, but we don't ever see the picture of the hymen after we heard there was a videotape of it. I'm just saying—

MR. KEITER: Well, because that would be highly intrusive and we would not want to do that to the complainant—I can think of only one case where we ever exposed some complainant's personal, private vaginal area, I mean, to a jury.

THE COURT: It's—that's up to you how you want to strategize it. But it's the key evidence in your case. And the jury knows you can make a video. So, I'm not telling you how to try your case; but this is not—this is not what direct and cross were designed for. I'm just telling you, I think you need to focus on the important issues in the case. I'm just letting you know.

Dkt 12-13 at 214–18. Likewise, the trial judge expressed skepticism during discussion with counsel about whether Sanders's prior convictions were a motive to lie, insofar as he faced a sentence of twenty-five years to life if convicted. Dkt 12-13 at 142–43, 157–59, 214–18.

Comments of skepticism such as these don't amount to improper coaching. The Supreme Court in *California Insurance Co v Union Compress Co* long ago stated:

In the courts of the United States, as in those in England, from which our practice was derived, the judge, in submitting a case to a jury, may, at his discretion, whenever he thinks it necessary to assist them in arriving at a just conclusion, comment upon the evidence, call their attention

> to parts of it which he thinks important, and
> express his opinion upon the facts . . . .

133 US 387, 417 (1890) (quotation omitted).

It is thus well-settled that it is "within the prerogative" of a trial judge "to manage the pace of a trial, to comment on the evidence, and even to question witnesses and elicit facts not yet adduced or clarify those previously presented." For example, see *United States v Reyes*, 227 F3d 263, 265 (5th Cir 2000) (quotation omitted); see also *United States v Blevins*, 555 F2d 1236, 1240 (5th Cir 1977).

Even so, the trial judge mustn't give the appearance of partiality. This curtails the prerogative of the trial judge to comment, question, and clarify, which determination is made by examining the record in its entirety. See *United States v Cantu*, 167 F3d 198, 202 (5th Cir 1999); *United States v Munoz*, 150 F3d 401, 413 (5th Cir 1998). And in the context of this case, the comment by the trial judge didn't have a significant impact on the jury and didn't give the appearance of partiality. It was a single comment within a three-day trial in which eleven witnesses (including Sanders) testified. For example, see *Reyes*, 227 F3d at 265–66 (questions favoring government by trial judge to six of seven witnesses though didn't have cumulative effect of depriving defendant of constitutional rights even though improper in at least two instances); *United States v Carpenter*, 776 F2d 1291, 1295–96 (5th Cir 1985) (improper comment by trial court to defense counsel that it still hadn't heard a defense not so substantial or prejudicial as to require reversal).

### iii.   Failure to object to bolstering

Sanders claims that his counsel failed to object to the State's bolstering the testimony of two important witnesses, Tara and her grandmother. Dkt 1 at 8.

The Texas Court of Criminal Appeals has said as to bolstering that the determination of a witness's truthfulness is a task solely for the jury. *Yount v State*, 872 SW2d 706, 710 (Tex Crim App 1993, *en banc*). That principle is set down in Texas Rules of Evidence 608 and 702, which prohibit lay and expert witnesses from testifying that a particular witness is truthful. See

16

also *Schutz v State*, 957 SW2d 52, 59 (Tex Crim App 1997, *en banc*). Of course, character witnesses may offer opinion or reputation testimony on the truthful or untruthful character of a witness. Tex R Evid 608. But they may not testify to the witness's truthfulness in the particular allegations. See Tex R Evid 608(a)(1); *Schutz*, 957 SW2d at 72; *Salinas v State*, 368 SW3d 550, 555 (Tex App—Houston [14th Dist] 2011), affirmed, *Salinas v Texas*, 570 US 178 (2013).

For context, the record reflects that trial counsel in fact successfully objected on the basis of improper bolstering to several of the State's questions. For example:

> Q. (BY MS. ASSAAD) When you were speaking—I'm sorry. When you were listening to Tara speak with Ms. Odhiambo in the forensic interview, did you find what Tara said clear and consistent?
>
> A. Yes, I did.
>
> Q. Did you find what Tara said consistent with what she had told the other officers?
>
> MR. COYNE: Judge, I object to that. I have a Motion in Limine which prohibits her from asking any witness to bolster or speak to the veracity of any other witness.
>
> THE COURT: Well, of course, you're alleging language that was not in the Motion in Limine; but that's bound to call for hearsay. So, his objection would be sustained.

Dkt 12-12 at 136.

> Q. So, she was lying when she said that you told her you would never hurt her?
>
> A. She was fabricating on a lot of stuff when she sat up here on the stand.
>
> Q. And that was one of the things that she was lying about?
>
> A. Yes, ma'am.

Q. That's not even a—that's not even a rude thing, right?

A. Ma'am?

Q. That's not even a rude thing to say about you, is it?

A. What?

Q. That you would never hurt her. Correct?

A. I would never hurt my daughter.

Q. That's not a mean thing for her to say that you said to her, right?

A. No. But why would I have to pull my daughter to the side to say, You know I would never hurt you?

Q. Well, at that time you knew what you were going to do to her, right?

A. I would never do anything to my daughter.

Q. So, you know that her saying that—her explaining that you said that to her makes her story even more believable, doesn't it?

A. Ma'am? Say that again?

MR. COYNE: Judge, I'm going to object to the comment on the veracity of other witnesses.

THE COURT: Sustained.

Dkt 12-13 at 192.

Q. But you're telling the jury that when Tara told them what you said to her about angel dust, she was making that up?

A. Yes, ma'am.

MR. COYNE: Again, Judge, she's commenting on the veracity of another witness. Could you just instruct her not to do that anymore?

THE COURT: Sustained.

Dkt 12-13 at 205.

MS. ASSAAD: And you have a motive to lie, right?

18

A. No, ma'am.

Q. You don't think that facing prison is a motive to lie?

A. Facing prison?

Q. You don't think that facing a conviction for sexually assaulting a child is a motive to lie?

A. I believe if you tell the truth, the truth shall set you free.

Q. Just as Tara said, correct?

A. I guess.

Q. And you're telling the jury that Tara is lying because—

MR. COYNE: Judge, again, she is commenting on the veracity of other witnesses, and I don't know how to make her stop.

THE COURT: Sustained.

Dkt 12-13 at 213–214.

Despite this apparent attention to the State's bolstering, Sanders asserts three instances where his counsel should have objected but didn't. Dkt 1 at 8. One pertains to questioning by the prosecutor of Officer Kelley:

Q. (BY MS. ASSAAD) Did you speak with [the grandmother], as well?

A. I did.

Q. And you also said that that is Tara's grandmother, right?

A. Correct.

Q. What was her demeanor when you spoke with her?

A. To me, [the grandmother] is definitely a spiritual woman. She was definitely -- I wouldn't say she was really emotional, but she was able to provide me with clear and consistent information. Definitely an excellent

woman, and she was very -- very supportive throughout the investigation.

Q. When Tara was at the CAC, did she also have a medical examination?

A. She did.

Q. As part of your investigation, do you receive the results of that medical examination?

A. We did.

Q. Did you also speak with [a witness], the outcry witness in this case?

A. I did.

Q. Did -- what was her demeanor when you spoke with her?

A. I would say the same. She was definitely -- appeared to be a spiritual woman. And based on the information she provided, it was consistent with the forensic interview, as well.

Dkt 12-12 at 137–38.

Another pertains to questioning by the prosecutor of Sanders himself:

Q. And [the grandmother] is the person who you saw come here and testify, right?

A. Yes, ma'am.

Q. Tara's grandmother?

A. Yes, ma'am.

Q. You spent a lot of time with [the grandmother], right?

A. Who me?

Q. Yes.

A. No.

Q. You haven't?

A. I spent a few times here and there, but we never just spent a whole like a lot of time like that.

Q. So, you have only been with [the grandmother] a few times?

A. Yes, ma'am.

Q. And that's your daughter's grandmother, right?

A. Yes, ma'am.

Q. That's who your daughter --

A. I never -- I'm sorry.

Q. That's who your daughter lives with?

A. Yes, ma'am.

Q. Do you think that [the grandmother] is a good person?

A. Yes, she a good person.

Q. Do you think she has done a good job of raising Tara?

A. She had a hand in it.

Q. She had Tara since Tara was 3 weeks old, right?

A. No, no. No, ma'am.

Q. Have you ever had Tara in your custody?

A. Well, me and her mother used to stay together.

Q. For just a year, right?

A. Yes, ma'am.

Q. You think Tara is a good kid, right?

A. She is an awesome kid.

Q. You really proud of her, right?

A. Yes, ma'am.

Dkt 12-13 at 175–76.

Neither of those exchanges involve bolstering questions. Nowhere does the prosecutor ask questions pertaining to the truthfulness of a witness in that particular occasion. *United States v Taylor*, 210 F3d 311, 318–319 (5th Cir 2000). To the contrary, the questions pertain to the two witnesses' general demeanor and

consistency, which is legitimate inquiry. *United States v Aguilar*, 645 F3d 319, 323 (5th Cir 2011).

The third instance also pertained to questioning of Sanders. Dkt 12-13 at 213–14. But trial counsel there successfully objected as to bolstering, mooting an ineffectiveness claim. And it wasn't a bolstering question in any event.

None of this shows that the performance by trial counsel fell below objective standards of reasonableness. But even assuming these instances showed deficient performance in failing to object to bolstering questions, Sanders hasn't shown prejudice. That is, he hasn't shown there is a reasonable probability that the result would have been otherwise if his counsel successfully objected to a few largely insignificant questions. The Fifth Circuit holds that an ineffectiveness claim may be disposed of solely on the basis of inability to demonstrate prejudice. See *Mays v Stephens*, 757 F3d 211, 215 (5th Cir 2014).

### iv.   Failure to prepare Sanders to testify

Sanders alleges that his counsel failed to properly prepare him to testify. Dkt 1 at 9. He asserts that counsel didn't let him review his prior recorded statements made to law enforcement. That testimony, Sanders says, contradicted the entirety of the State's case. Ibid.

Trial counsel has "wide latitude in deciding how best to represent a client." *Yarborough v Gentry*, 540 US 1, 5–6 (2003). "When counsel focuses on some issues to the exclusion of others, there is a strong presumption that he did so for tactical reasons rather than through sheer neglect." Id at 8. Indeed, counsel's strategic choices, made after a thorough investigation of the law and facts relevant to plausible options, are virtually unchallengeable. *Strickland*, 466 US at 673; *Pape v Thaler*, 645 F3d 281, 289–90 (5th Cir 2011). "A conscious and informed decision on trial tactics and strategy cannot be the basis for constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness." *Cotton v Cockrell*, 343 F3d 746, 752–53 (5th Cir 2003).

On federal *habeas* review, this Court is mindful that "*Strickland* does not allow second guessing of trial strategy and must be applied with keen awareness that this is an after-the-fact

inquiry." *Granados v Quarterman*, 455 F3d 529, 534 (5th Cir 2006). In other words, simply because counsel's strategy was not successful does not mean counsel's performance was deficient. *Avila v Quarterman*, 560 F3d 299, 314 (5th Cir 2009).

In *Garza v Stephens*, 575 F Appx 404 (5th Cir 2014, *per curiam*), the Fifth Circuit found that trial counsel appeared to have acted reasonably in advising him not to testify. The Fifth Circuit noted that Garza would be exposed to cross-examination and a far wider inquiry into his past behavior, coupled with the fact that trial counsel believed Garza's testifying would waive two viable errors on appeal. "Indeed, given the severe potential problems that Garza's choosing to testify would have raised, we cannot say that his trial counsel was unreasonable even in failing to prepare him for that ill-advised testimony." Id at 413.

Assuming trial counsel failed to fully prepare Sanders to testify, Sanders only argues that Sanders would have been more effective if he had been better prepared, which does not come close to suggesting that "but for counsel's errors, the result of the proceeding would have been different." *Coble v Quarterman*, 496 F3d 430, 436 (5th Cir 2007).

Sanders fails to demonstrate that trial counsel's strategy was ill-chosen. To the contrary, the record indicates that counsel advised Sanders not to testify because it would open the door to Sanders's prior convictions. Counsel made the informed strategic decision not to call Sanders to testify, but Sanders insisted on taking the stand and providing his own account of events. Sanders denied that he sexually assaulted Tara and claimed he was never alone in his bedroom with her over the Christmas break. Dkt 12-13 at 160, 169, 207. Sanders claimed Tara falsely accused him of committing the offenses in retaliation for his attempt to discipline her. Id at 160–161.

On cross-examination, the prosecutor questioned Sanders about his lengthy criminal history, including several convictions for violating protective orders. Dkt 12-13 at 208–10. The prosecutor asked Sanders if he remembered the events over Christmas break of 2013; if his various medications for bipolar disorder and seizures affected his memory; whether the side effects of the medications he was taking on a daily basis

prevented him from realizing that Tara was in his bed rather than his wife; how he was able to remember the television program his wife was watching on the night of the assault, but he could not remember that Tara was in the bed; whether he became upset with Tara when she talked to other boys; whether he searched Tara's phone to monitor if she was talking to other boys; whether he was surprised by Tara's physical maturity; whether he thought Tara was jealous when she saw Sanders kiss Tara's mother; whether he wanted to prepare Tara for the real world by exposing her to drugs and sex; and whether he wrestled with Tara. Dkt 12-13 at 178–81.

Sanders testified on cross that he "might not remember all— the statements that I made with Officer Kelley, but quite a few statements that I have made with Officer Kelley." Dkt 12-13 at 186. The prosecutor then asked Sanders if he told the officer the truth, to which he replied that he did "try to." Ibid. Sanders was then asked if he was "trying to tell the jury the truth" at that moment, to which he replied, "Yes, ma'am." Ibid. The following exchange then took place:

> Q. And you now recall that you previously stated that you wrestled with Tara?
>
> A. Yes, ma'am.
>
> Q. And that you touched her legs when you did that, right?
>
> A. Ma'am?
>
> Q. You recall that you touched her legs when you wrestled with her, right?
>
> A. Yes, ma'am.
>
> Q. And you now recall that you stated regarding the second incident the second day that Tara took a shower in your room that day, right?
>
> A. Yes, ma'am.
>
> Q. And you now recall that you stated that Tara was always in your bed, correct?
>
> A. Yes.
>
> MS. ASSAAD: No further questions.

Sanders's counsel then conducted the following redirect examination:

> Q. (BY MR. COYNE) Mr. Sanders, how did you come to recall these statements that you made earlier?
>
> A. Because I watched the video of the interview that me and Officer Kelley had at the CAC.
>
> Q. Okay. And how long ago was that interview taken? Do you remember?
>
> A. I want to say in 2013.
>
> Q. Okay. Almost two years ago?
>
> A. Yes, sir.
>
> Q. And do you recall it pretty vividly or not so much?
>
> A. Not so much.
>
> Q. Why is that?
>
> A. Because I have epilepsy. I have seizures and I take a lot of meds. And I was on some medication when I told him.
>
> Q. And did you tell the officer that at the time?
>
> A. Yes, sir.
>
> Q. You were—you specifically told him you were on medication?
>
> A. I specificall—
>
> MS. ASSAAD: Calls for hearsay, Your Honor, objection.
>
> THE COURT: Are you referring to during the statement?
>
> MR. COYNE: Yes, Your Honor.
>
> THE COURT: Overruled.
>
> A. Yes, sir.
>
> Q. (BY MR. COYNE) And that was made clear to the officer, correct?

A. Yes, that I was on medication.

Dkt 12-14 at 6–7.

Sanders argues that he wouldn't have contradicted himself if he were better prepared. But even if his counsel had allowed Sanders to review his taped statement to Officer Kelley, he doesn't establish that he wouldn't have contradicted himself during his testimony.

On the other hand, the record does establish that trial counsel advised Sanders not to take the stand. Dkt 12-13 at 153–54. And the primary strategy of trial counsel remained intact, seeking to attack Tara's credibility. For instance, he tried to discredit her by asking why she didn't immediately make an outcry when so many family members were in the apartment at the time; by asking how it was possible for Sanders to have sexually assaulted Tara while a family friend was in the bed; by questioning her on supposition that she didn't want her parents to get back together; and by questioning her about making up the sexual assault to retaliate against Sanders after he disciplined her with a belt. Dkt 12-12 at 71–84.

To the contrary, as already summarized, the jury was presented an array of graphic testimony and evidence supportive of Sanders's guilt. In that sense, it simply can't be said that it is reasonably likely that the trial result would have been different if his trial counsel had prepared him differently to testify.

v.   Failure to request a balancing test

Sanders contends that his counsel rendered ineffective assistance when he failed to request a balancing test for admitting Sanders's prior convictions. Dkt 1 at 9.

The record shows that Sanders was advised by his counsel that the prosecution would introduce his many prior convictions. Sanders voiced his understanding but testified anyway. Dkt 12-13 at 154. Several of his prior convictions were then introduced to impeach him, including attempted violation of a protective order, multiple violations of a protective order, and assault on a family member. Id at 208–10.

Rule 609(a) of the Texas Rules of Evidence allows admission of prior convictions to impeach the credibility of a witness absent

unfair prejudice that outweighs probative value of convictions. Subsection (c) also provides:

> (c) In General. Evidence of a criminal conviction offered to attack a witness's character for truthfulness must be admitted if:
>
> (1) the crime was a felony or involved moral turpitude, regardless of punishment;
>
> (2) the probative value of the evidence outweighs its prejudicial effect to a party; and
>
> (3) it is elicited from the witness or established by public record.

The prior convictions used to impeach Sanders were admissible under this rule. Indeed, he admitted that he had several convictions for violating protective orders for his ex-wife. The prior convictions involved felonies or crimes of moral turpitude—while also relating directly to why Tara believed she was unable to report the crime immediately. Dkt 12-12 at 32, 54, 77. It is well-established that such convictions are probative of truthfulness, and they are not unduly prejudicial. *Morrow v Dretke*, 99 F Appx 505, 511–12 (5th Cir 2004, *per curiam*), citing *Theus v State*, 845 SW2d 874, 877 n 1 (Tex Crim App 1992, *en banc*). And they were elicited from Sanders. As such, the trial judge was required to admit them.

Sanders fails to explain a basis upon which the trial judge would have determined that these prior convictions weren't admissible for purposes of impeaching his credibility during the guilt/innocence stage. Rather, it appears that objection by his trial counsel would have been futile. As such, he can't show deficiency for failing to object or make a frivolous motion. *Roberts v Thaler*, 681 F3d 597, 611 (5th Cir 2012).

Nor can he show prejudice. In actuality, the harm of which Sanders complains derives from the fact that his prior convictions impeached his credibility—the very purpose for which such evidence may be admitted. He points to no other undue prejudice that the convictions purportedly engendered.

Sanders appears to assert that the trial judge stated that she would have excluded the evidence if requested. Dkt 1 at 9. But

he cites only a statement that she "never did make a ruling as to whether or not his priors were more probative and prejudicial because nobody ever asked for that ruling." Dkt 12-13 at 214. That in no way indicates that the ruling would have been favorable to Sanders. To the contrary, the evidence shows that such motion would quite likely have been unfavorable to him.

### vi.   Conclusion as to assistance of trial counsel

As to each of the foregoing assertions, Sanders hasn't shown that the performance by his trial counsel was deficient or that he was actually prejudiced as a result. *Strickland v Washington*, 466 US 668 (1984). The Texas Court of Criminal Appeals also denied this claim for ineffective assistance without written order, meaning it affirmed the decision by the First Court of Appeals. See Dkt 12-32 at 1; *Ex parte Torres*, 943 SW2d at 472. Sanders fails to establish (as is his burden) that the state court's decision was contrary to clearly established federal law or an objectively unreasonable application of it. 28 USC § 2254(d); *Cobb*, 682 F3d at 372–73. As such, Sanders hasn't shown that he is entitled to *habeas corpus* relief on this claim. 28 USC § 2254(d)(1).

### c.   Ineffective assistance of appellate counsel

Sanders argues that his appellate counsel was ineffective for reasons related to the above assertions as to ineffective assistance of trial counsel. See Dkt 1 at 6–9.

A criminal defendant is constitutionally entitled to effective assistance of appellate counsel when he has a right to appeal under state law. *Evitts v Lucey*, 469 US 387 (1985); *United States v Phillips*, 210 F3d 345, 348 (5th Cir 2000). The *Strickland* standard applies to complaints about the performance of counsel on appeal. See *Smith v Robbins*, 528 US 259, 285 (2000). And so to obtain relief, Sanders must demonstrate that appellate counsel's conduct was objectively unreasonable under then-current legal standards, and that there is a reasonable probability that, but for the deficient performance, the outcome on appeal would have been different. See *Smith*, 528 US at 285; *Higgins v Cain*, 720 F3d 255, 260–61 (5th Cir 2015).

Appellate counsel who files a merits brief needn't and shouldn't raise every nonfrivolous claim. Such counsel may instead select from among available arguments in order to

maximize the likelihood of success on appeal. *Smith*, 528 US at 288; *Jones v Barnes*, 463 US 745, 751 (1983). The process of winnowing out weaker arguments on appeal and focusing on those more likely to prevail is the hallmark of effective appellate advocacy. *Smith v Murray*, 477 US 527, 536 (1986); *Jones*, 463 US at 751–52. Moreover, the Supreme Court instructs in this regard that appellate arguments that assertedly should have been raised are considered by comparison to arguments that were raised. Declining to raise a claim on appeal isn't deficient performance unless that claim was plainly stronger than those actually presented to the appellate court. See *Davila v Davis*, 137 S Ct 2058, 2067 (2017); *Smith*, 528 US at 288.

Sanders again contends that the trial judge improperly commented on the weight of the evidence during *voir dire*, which he says vitiated the presumption of innocence and jury impartiality. He argues here that appellate counsel rendered ineffective assistance because she failed to raise this claim as one of fundamental error. Dkt 1 at 6. It has already been determined above that the subject comments weren't improper. Assertion about supposed failures by his trial counsel in this regard lacks merit. Counsel can't be deficient for failing to press a frivolous point. *Koch v Puckett*, 907 F2d 524, 527 (5th Cir 1990); *Green v Johnson,* 160 F3d 1029, 1036–37 (5th Cir 1998), cert denied, 525 US 1174 (1999), citing *Sones v Hargett,* 61 F3d 410, 415 (5th Cir 1995). Where the grounds underlying alleged errors by appellate counsel are found to lack merit, failure to pursue appellate relief on those bases doesn't constitute ineffective assistance of counsel. *Styron v Johnson*, 262 F3d 438, 449 (5th Cir 2001). More precisely, no prejudice can be shown where the reliability of the result on appeal necessarily hasn't been undermined.

Sanders also argues that his appellate counsel should have argued that the trial court erred in denying the motion for new trial based on the failure of trial counsel to object to the alleged-improper comment by the trial judge. Again, it has already been established that no improper comment occurred.

Beyond this, appellate counsel did indeed argue for a new trial based on ineffective assistance of trial counsel—although

basing it on argument that trial counsel was ineffective in failing to investigate and present mitigation evidence. Dkt 12-17 at 7. In particular, appellate counsel argued that Sanders received ineffective assistance of counsel as to "trial counsel's failure to investigate Sanders' mental health history and did not contact witnesses who were willing and able to testify regarding Sanders' positive character traits." Id at 15. Appellate counsel also presented the argument that the trial court abused its discretion in overruling trial counsel's objection to an improper comment made by the State during closing argument and in sustaining his objection to but failing to instruct the jury to disregard another such improper comment. Id at 7. These were strategic decisions on appeal, raising arguments apparently thought more likely to succeed. The constitutional complaint by Sanders now—that appellate counsel failed to raise other and different claims— doesn't show plainly stronger appellate arguments than those actually raised on direct appeal. Indeed, while ultimately determined to be without merit, those points of error on direct appeal were at least as strong (if not stronger) than the failures he now asserts. Not presenting them wasn't deficient performance, where the arguments weren't plainly stronger than those actually presented. See *Davila*, 137 S Ct at 2067; *Smith*, 528 US at 288.

As to each of the foregoing assertions, Sanders hasn't shown that the performance by his appellate counsel was deficient or that he was actually prejudiced as a result. *Strickland v Washington*, 466 US 668 (1984). The Texas Court of Criminal Appeals also denied this claim for ineffective assistance of appellate counsel without written order, meaning it affirmed the decision by the First Court of Appeals. See Dkt 12-32 at 1; *Ex parte Torres*, 943 SW2d at 472. Sanders fails to establish (as is his burden) that the state court's decision was contrary to clearly established federal law or an objectively unreasonable application of it. 28 USC § 2254(d); *Cobb*, 682 F3d at 372–73. As such, Sanders hasn't shown that he is entitled to *habeas corpus* relief on this claim. 28 USC § 2254(d)(1).

4.    Certificate of appealability

Rule 11 of the Rules Governing Section 2254 Cases requires a district court to issue or deny a certificate of appealability when

entering a final order that is adverse to the petitioner. A certificate of appealability will not issue unless the petitioner makes "a substantial showing of the denial of a constitutional right." 28 USC § 2253(c)(2). This requires a petitioner to demonstrate "that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v McDaniel*, 529 US 473, 484 (2000). Where the court denies relief based on procedural grounds, the petitioner must show that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right," and that they "would find it debatable whether the district court was correct in its procedural ruling." Ibid.

The Court finds that reasonable jurists wouldn't find this Court's assessment of the constitutional claims debatable or wrong. As such, Sanders hasn't made the necessary showing to obtain a certificate of appealability.

A certificate of appealability will be denied.

5.   Conclusion

The pleadings and state court records show that the federal petition for a writ of *habeas corpus* brought by Petitioner Daniel Morris Sanders lacks merit.

The motion by Respondent Bobby Lumpkin for summary judgment is GRANTED. Dkt 11.

The motion by Sanders for partial summary judgment is DENIED. Dkt 17.

The petition by Sanders for a writ of *habeas corpus* is DENIED. Dkt 1.

Sanders's pleadings are replete with references to the trial transcript. His motions for discovery and production of summary judgment evidence are DENIED. Dkts 13, 15.

His motion for extension of time to respond is GRANTED *nunc pro tunc.* Dkt 16.

Any other pending motions are DENIED AS MOOT.

This case is DISMISSED WITH PREJUDICE.

A certificate of appealability is DENIED.

SO ORDERED.

Signed on ___March 31, 2021___, at Houston, Texas.


Hon. Charles Eskridge

United States District Judge